## C eIN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No.: 1:23-cr-00177-ABJ** |
| | ) | |
| **SHANE LAMOND,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT SHANE LAMOND'S OPPOSITION TO UNITED STATES' MOTION TO ADMIT CERTAIN EVIDENCE PURSUANT TO FEDERAL RULES OF EVIDENCE 807 AND 801(d)(2)(E)

Defendant Shane Lamond ("Mr. Lamond"), through counsel, submits this Opposition to the United States' Motion to Admit Certain Evidence Pursuant to the Federal Rules of Evidence 807 and 801(d)(2)(E) ("Motion"). The evidence at issue (a video clip from a documentary and witness testimony) cannot be admitted under Federal Rules of Evidence 807 ("Rule 807") or 801(d)(2)(E) ("Rule 801(d)(2)(E)"). First, the evidence does not fit into the narrow exception of Rule 807 because it is unreliable, and there is other evidence that is more probative on the point for which the government is offering the evidence. Second, the evidence does not fit into the conspiracy exception under Rule 801(d)(2)(E) because the government has offered no evidence of a conspiracy; there is no evidence that Mr. Lamond was party to a conspiracy; and there is no evidence that demonstrates Mr. Lamond or Enrique Tarrio were acting in furtherance of any conspiracy and no conspiracy has been charged. The Motion should be denied.

At minimum, though, Mr. Lamond requests that the Court wait to make a determination regarding the evidence until trial.

However, if the Court admits the evidence over objection, Mr. Lamond requests procedural safeguards, including limiting jury instructions and permitting cross-examination, to ensure he is not unfairly prejudiced.

## I.    LEGAL STANDARD

A district court has inherent authority to rule on motions *in limine*. *See United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 174 (D.D.C. 2015). ("The Supreme Court has recognized that '[a]lthough the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials.'") (quoting *Luce v. U.S.*, 496 U.S. 38, 41, n.4 (1984)). This inherent authority exists "as an important mechanism to . . . insulat[e] the jury from inadmissible evidence and further the purpose of the [Federal Rules of Evidence], generally, to administer the proceedings 'fairly . . . to the end of ascertaining the truth and securing a just determination.'" *Id.* (quoting Fed. R. Evid. 102).

## II.    DISPUTED EVIDENCE

The government wants to admit a clip from a documentary and witness statements from an FBI interview. In the brief video clip, someone tells Tarrio "you knew it was happening" to which he responds "I knew as soon as I got to the airport . . . he texted me in the air . . . from the air was when I knew they signed the warrant." *See* Motion Ex. H. Tarrio does not say anything other than "he" when identifying who told him about the warrant. *Id.* He doesn't mention that the person was law enforcement, or his own lawyer, or one of a myriad of people aware that MPD was seeking to arrest him in connection with the incident. *Id.* In fact, he provides no identifying features or other details about how he discovered there was a warrant. *Id.* The video is filmed by documentarian Nicholas Quested. Motion at 14. Allegedly, the video shows Tarrio with "known

associates and members of the Oath Keepers" but neither Tarrio nor the individual with whom he speaks wears or says anything identifying them as being members or associates of the Oath Keepers. *Id.* at 15. The government wants to admit this clip, through Quested's testimony, of Tarrio's out-of-court statements in support of their claim that Mr. Lamond "leaked sensitive law enforcement information to Tarrio and then lied about it." *Id.* at 18.

The government also asks the Court to admit statements from Tarrio to Jeremy Bertino, who pled guilty to a two-count Information that included Seditious Conspiracy and Unlawful Possession of a Firearm by a Prohibited Person in connection with "his role in the events that took place at the Capitol Builidng in Washington, D.C. on January 6, 2021. *Id.* at 20. As part of his plea, Bertino admitted he is a regional leader of the Proud Boys "who followed the commands of Tarrio and other Proud Boy leaders." *Id.* The government asks the court to admit Tarrio's statements to Bertino; that he "referred to the Defendant as his 'federal agent,' as 'my fed' or 'my guy,' that Tarrio told him the Defendant was a source of information, and 'Shane' was the person who told him about the arrest warrant" (the "Bertino Statements"). *Id.* at 13-14.

## III. RULE 807 SHOULD BE NARROWLY APPLIED, CONSISTENT WITH THE 2019 AMENDMENTS

While the government correctly characterizes Rule 807 as an "extremely narrow" exception that allows for admission of "very important and very reliable" out-of-court statements, the government nevertheless asks the Court to admit evidence that doesn't fit into the exception. *Id.* at 2 (citing *United States v. Mason*, 951 F.3d 567, 574 (D.C. Cir. 2020); *see also United States v. Slatten*, 865 F.3d 767, 807 (D.C. Cir. 2017) ("recogniz[ing] that the residual hearsay exception is 'extremely narrow and require[s] testimony to be very important and very reliable'"). Indeed, the very case cited by the government cites illustrates this point. *See Mason* at 574. In *Mason*, the court did not allow in evidence because the "extremely narrow" Rule 807

exception should be used "'sparingly,' 'only in the most exceptional circumstances.'" *Mason*, 951 F.3d at 574-75. The court refused to apply Rule 807 to a handwritten letter because the party could not demonstrate the requisite reliability as to whom authored the letter. *Id.* Here, the government fares no better. As described *infra* Sections IV and V, like the letter in *Mason*, the documentary evidence and witness statements are unreliable and do not fit into the most exceptional circumstances needed to apply the sparingly-used Rule 807.

Further, as the government admits, the 2019 amendments "streamline" how the court should analyze evidence under Rule 807 (Motion at 2), but the amendments do not broaden, or expand, what evidence can be admitted under the Rule. *See United States v. Smith*, No. CR 19-324 (BAH), 2020 WL 5995100, at *5 (D.D.C. Oct. 9, 2020) (noting how the 2019 amendments focus on the reliability element but don't substantively change the Rule's narrow application). Instead, the amendments emphasize the importance of the "very reliable" prong of Rule 807, instructing courts to "proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness." Motion at 2 (quoting the Fed. R. Evid. 807, Advisory Comm. Note on 2019 Amendments). In practice, even after the 2019 amendments, Rule 807 is "intended to be a last resort." *Smith*, 2020 WL 5995100, at *5.

Even so, the government mischaracterizes that the amendments somehow "leave some doubt . . . as to whether the hearsay exception remains 'extremely narrow.'" Motion at 3 (quoting *Smith*). In *Smith*, for example, the Court admitted evidence under Rule 807 after the 2019 amendments because of extreme circumstances related to a minor victim of sexual abuse. *See id.* There, the Court admitted the child victim's interview with an expert child forensic examiner only after an extensive analysis of both the "circumstantial guarantees surrounding the making of the statement itself," i.e., that the interviewer had conducted hundreds of hours of children

forensic interviews, had extensive training, and met industry standards, and "any independent evidence corroborating the statement." *Smith*, 2020 WL 5995100, at *7 (quoting the Fed. R. Evid. 807, Advisory Comm. Note on 2019 Amendments). Moreover, the *Smith* analysis included an added layer of analysis for the "specific context of child victims of sexual abuse." *Id.* The Court ultimately admitted the expert interview under Rule 807, in part because the added layer of child abuse was examined under Eighth Circuit precedent and in part because the government provided concrete evidence to corroborate the interview, including sexually explicit photographs and messages sent to the child on the defendant's phone. *See id.* at 2, 12. Thus, *Smith* is not the typical example of a Rule 807 analysis (as should be done here), but a rare case where exceptional circumstances require evidence be admitted under Rule 807.

Federal courts in D.C. are less likely to apply the narrow exception to fact patterns without exceptional circumstances, and even after 2019, courts still examine both reliability and importance. *See, e.g., United States v. Benton*, 656 F. Supp. 3d 1 (D.D.C. 2023); *see also Pietrangelo v. Refresh Club, Inc.*, No. 18-CV-1943 (DLF), 2023 WL 6388880 (D.D.C. Sept. 29, 2023). In *Benton*, the Court determined a witness' out of court statements to the FBI were inadmissible under Rule 807. 656 F. Supp. at 10. There, the Court found the statements were unnecessary because other admissible evidence contained much of the same information and were "unreliable for several reasons," most notably because the declarant had incentive to lie. *Id.* In denying admission, the Court emphasized "Rule 807 **remains** an 'extremely narrow' exception to hearsay." *Id.* (emphasis added). Similarly, in *Pietrangelo* the Court held newspaper articles "failed to satisfy" the "'extremely narrow' hearsay exception." 2023 WL 6388880, at *10 (quoting *Slatten,* 865 F.3d 767, 807). Here, like the evidence in *Benton* and *Pietrangelo*, the

evidence the government asks the Court to admit fails to satisfy the extremely narrow hearsay exception.

## IV.    RULE 807 DOES NOT APPLY TO THE VIDEO CLIP

The government cannot demonstrate the video fits into the extremely narrow Rule 807 exception and is only hoping to offer it to avoid calling Tarrio at trial. The government fails to carry its burden to demonstrate that the statements in the video are very reliable and very important and that "the proffered hearsay [is] more probative on the point for which it is offered than any other reasonably attainable evidence."[1] *Smith*, 2020 WL 5995100, at *5.

### A.    The Video, and Statements in It, are Unreliable

A very reliable statement "is supported by sufficient guarantees of trustworthiness--after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement." Fed. R. Evid. 807(a)(1); *see also Slatten,* 865 F.3d at 807 ("we look to the 'totality of circumstances . . . that surround the making of the statement and that render the declarant particularly worthy of belief.'") "A central task for a court evaluating a Rule 807 motion is thus 'to gauge whether the declarant was 'highly unlikely to lie' in making their out-of-court statement." *Id.* To do so, the court can look to evidence corroborating the statement, whether the declarant had incentive to speak truthfully, and whether the declarant had been consistent in his story. *See Smith*, 2020 WL 5995100, at *7; *see also Slatten,* 865 F.3d at 807 (holding the declarant met the extremely narrow Rule 807 exception because his statements that his co-defendant fired shots during an encounter in Iraq were corroborated and made with immunity).

---

[1] Not only does the evidence at issue fail to qualify for any hearsay exception, but admission would also violate the Confrontation Clause of the Sixth Amendment. The statements at issue discuss criminal activity and are thus testimonial statements that the declarant could reasonably believe would be used later at trial. *See Crawford v. Washington*, 541 U.S. 36 (2004).

Here, the totality of circumstances show Tarrio was likely to lie and that he had incentive to do so. To demonstrate reliability, the government first posits the trustworthiness of Quested, "an award-winning filmmaker" who "developed a rapport with Tarrio and other Proud Boy members" and "followed them around to film and take pictures at various events." Motion at 14. The government argues Quested "would testify that the video truly and accurately depicts Tarrio's actions and statements." *Id.* at 15. Documentaries, however, "are not an objective but a subjective device, a medium that marshals systems of representation to encourage point of view about something."[2] Quested's work captures an inherently subjective point of view, in part because of his craft, but more importantly because his very presence affects the statements and actions around him, namely that Tarrio knew he was on camera, knew he was being filmed for a documentary about a group for which he was the chairman, and thus, Tarrio was highly likely to lie in that scenario. *See Smith*, 2020 WL 5995100, at *7.

Nevertheless, to strengthen its argument, the government next claims that Tarrio had incentive to tell the truth. Specifically, the government contends that he "makes the statements to known associates" and wouldn't lie to them. Motion at 15. Untrue. First, the government proffered no evidence that the individuals with whom Tarrio is speaking is a known associate of his other than the video clip and Quested's testimony. Second, Tarrio has an incentive to lie while he is being filmed for a documentary about his own group, the Proud Boys, to bolster his position with them and to look good on camera; plus, he has a history of lying about the work he

---

[2] *Representation through Documentary: A Post-Modern Assessment*, UNIVERSITY OF MISSOURI, Mar. 30, 2012, https://cwp.missouri.edu/2012/representation-through-documentary-a-post-modern-assessment/ (quoting Toby Miller, Technologies of Truth: Cultural Citizenship and the Popular Media, at 183.

does with the Proud Boys to inflate his image and protect his own interests.[3] Any argument that his word is reliable–especially when he makes statements in front of a documentarian like Quested—must be questioned by the Court. The Government further argues that Tarrio "had no incentive to lie within the context of the documentary." *Id.* at 16. In reality, the political actors Tarrio associates with have every incentive to lie on camera, to both spread their agendas and play to their constituencies. Tarrio knew he was on film when he made the statements at issue then asked for Quested to leave so he could speak privately with his associates. *Id.* at 16. That conversation was not recorded. This shows not that the recorded statements were reliable, but that he was aware he was on camera and chose his words accordingly.[4]

The government also argues that Tarrio's statements are self-inculpatory and thus more trustworthy as a statement against interest. *See id.* at 15-16. The government stipulates that Tarrio's knowledge of the warrant "is not a confession of a crime" but argues the statements are against his penal interest "when viewed in the context of the instant offense [because] it would likely help police find evidence of criminal wrongdoing." *Id.* at 16. Their proposition relies on *Williamson v. United States* for the Court's point that facially neutral statements "may actually be against the declarant's interest. 'I hid the gun in Joe's apartment' may not be a confession of a

---

[3] As a political operative, Tarrio is tied directly to the Trump administration, acting as the Florida state director of Latinos for Trump, and a close affiliate of convicted fraudster and Trump confidant Roger Stone. Philip Bump, *Enrique Tarrio was not just a reandom dedition*, THE WASHINGTON POST,  May 4,2023, https://www.washingtonpost.com/politics/2023/05/04/proud-boys-trump/; *see also*  Ryan Lucas, *Roger Stone Sentenced to More Than 3 Years Amid Furor Over Trump and DOJ*, NPR, Feb. 20, 2020, https://www.npr.org/2020/02/20/807099176/roger-stone-sentenced-to-3-years-amid-furor-over-trump-involvement-in-doj-cases.

[4] Tarrio demonstrated his ability to lie when he worked as an undercover informant for law enforcement agencies and then lied about it, directly contradicting a federal prosecutor, an FBI agent, and his own attorney when asked about his involvement. https://www.reuters.com/article/idUSKBN29W1O4/. Tarrio said he "never helped investigate others" despite Judge Joan A. Leonard confirming he "provided substantial assistance in the investigation and prosecution of other persons involved in criminal conduct."

crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory." 512 U.S. 594, 603 (1994). There, the actions were against the declarant's interest because there had been a crime (murder with a gun) and having the gun in the defendant's possession linked him to the crime. Here, Tarrio, after being released from custody, simply states there is a warrant for his arrest.  His knowledge of the warrant is not a crime like the murder with a gun in *Williamson*; and admitting that he has knowledge of the warrant does not link him to a crime like having the gun did in *Williamson*. Rather, there is no indication any crime was committed when Tarrio made the statements on film.[5] He doesn't say where he got the information on the warrant, other than from some unidentified male; he doesn't say he plans to avoid the summons or flee, nor does he say that he and Mr. Lamond are engaged in a conspiracy to that end. *See infra* Section VI.  In fact, Tarrio's actions speak louder than his words; he knew about the warrant when he landed in Virginia, came to the District of Columbia, and was arrested shortly after he landed. Motion at 17.

The government closes its reliability argument by claiming there is corroborating evidence, specifically digital evidence and business records. *See id.* at 16-17. In particular, the government cites airline records that show Tarrio was on his flight when he (1) received encrypted messages from Lamond at 1:02 p.m., and (2) texted his Proud Boys cronies that the warrant "was just signed" at 1:31 p.m. *Id.* at 17.[6] This conjecture is not the corroboration

---

[5] *See* D.C. CODE § 22–722(a)(6). A person commits obstruction of justice if that person "corruptly . . . obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding." Here, the video evidence doesn't show anyone acting corruptly. It just shows that Tarrio had knowledge of a warrant for his arrest. The government would have this court infer corruption, but there is no indication in the video of who told Tarrio about the warrant.

[6] Interestingly, the government does not indicate that the statement itself is inaccurate. The warrant was not "just signed" when he was in flight, but rather days before. Tarrio and Mr. Lamond had spoken several times after the warrant was issued and Mr. Lamond was aware.

contemplated by Rule 807. *See Smith*, 2020 WL 5995100, at \*7. In fact, the government's primary case cite illustrates the need for more reliable corroboration; the *Smith* Court admitted evidence under Rule 807, not because the government provided a window of time the defendant might have sent sexually explicit text messages, but because there was concrete evidence showing the substance of the messages. *Id.* at \*12. Here, there is no evidence of the substance of Mr. Lamond's messages and no discussion of whether Tarrio received other messages while on the plane. Based on the totality of the circumstances, the Court should find the statements in the video and the video are not very reliable under Rule 807; Tarrio was highly likely to lie in a documentary being filmed about his political group, and in fact, asked the documentarian to stop filming so he could speak privately. He had no incentive to tell the truth to bolster his image in the documentary and there is no corroborating evidence.

**B.    The Statements in the Video, and the Video, Are Not Very Important, and There is More Probative Evidence Available**

Under Rule 807, a very important statement "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). The government argues the "timing of when Tarrio found out about the warrant" is probative of who told him about the warrant, and that because Mr. Lamond sent him an encrypted message, "evidence is not otherwise available." Motion at 18. The government relies on *Smith* in support, noting that the witness there "was unable to remember the details of" a sexual assault that occurred when she was a child. *See id*. Here, that is not the case. The Court has an opportunity to determine whether Tarrio or his associates remember the details because Tarrio is available to testify at trial about that conversation and the unrecorded, private

---

Certainly, if Mr. Lamond intended to share the information with Tarrio, ostensibly to have Tarrio avoid coming into Washington, D.C. and being arrested on the non-extraditable misdemeanor warrant, it would have been before Tarrio ever boarded a plane to DCA.

conversation immediately following the video clip at issue. So too are his associates, if Tarrio told them more after the camera stopped rolling. The government cannot satisfy this element of Rule 807, and the Motion should be denied.

## V.   RULE 807 DOES NOT APPLY TO THE STATEMENTS TO BERTINO

The government similarly fails to establish the statements to Bertino are very reliable and very important. These statements do not qualify for the extremely narrow exception contemplated by Rule 807 and outlined *supra* sections III-IV.

### A.   Bertino's Statements Are Unreliable

To demonstrate Rule 807's reliability prong, the government notes Bertino had "two big incentives to tell the truth." *Id.* at 21. First, that he was "almost completely immunized" when he made the statements to investigators.[7] *Id.* Second, that Bertino knew he would face criminal liability if he lied to investigators. *See id.* at 22. But speaking to law enforcement does not meet the extremely reliable standard for Rule 807. In fact, "people lie to the FBI all the time." *Benton*, 656 F. Supp. 3d 1, 10. And like the declarant in *Benton*, Bertino had incentive to lie to investigators; the charges he faced for are much less of a risk than the criminal liability imposed by 18 U.S.C. § 1001 for lying to an investigator. *Id.*; *see also* Motion at 21-22.

Once again, the government (not ironically, despite the various statements that the government has made and written about Tarrio in his case) relies on Tarrio's character to support its reliability argument, claiming that he had "no reason to lie to Bertino about his relationship with [Mr. Lamond]" because of their personal relationship. *Id.* at 22-23 (citing Tarrio and Bertino's membership in the Proud Boys, "their close relationship," and "their similar

---

[7] To the extent that "almost completely" stands for the proposition for which the government offers it. Almost completely means it was not quite, or sort of, immunized. Hardly a grand pronouncement or equivalent to being fully immunized.

ideologies"). Tarrio had similar incentive to lie to Bertino as he did in the video: to advance his political agenda, to make himself appear to have an insider or source in law enforcement, to appear to be all knowing, or to be brave and fearless and willing to come to town even knowing there was a warrant for his arrest. The government asks the Court to admit statements Tarrio made to Bertino in a District of Columbia bar with other Proud Boy associates, including an introduction Tarrio made between (someone Bertino thinks is) Mr. Lamond and Bertino where he referred to Mr. Lamond as "Shane" and called him "my guy." *See id.* at 20-21. It's unclear whether Tarrio speaks to Bertino privately or if other Proud Boys heard. Either scenario presents Tarrio with incentive to lie. If he was speaking privately to Bertino, he has incentive to embellish his relationship with law enforcement to bolster his reputation with Bertino, a Proud Boys leader who followed Tarrio's commands. If other Proud Boys heard that only serves to further bolster Tarrio's reputation and alleged connection to law enforcement. [8]

The government also asks the Court to admit Bertino's observations of Mr. Lamond from that night. *Id.* at 20-21 (Specifically, that Tarrio shook Mr. Lamond's hand and that Mr. Lamond appeared "legitimate because of his demeanor and friendliness, as well as the the way Tarrio seemed to hold him in high regard as a source"). These observations are unreliable because Tarrio had the same incentive to act in a manner that exaggerates his relationship with Mr. Lamond as he did when speaking about or to him in front of Bertino. Additionally, Mr. Lamond had an incentive to act familiar with Tarrio, as Mr. Lamond's job required him to keep Tarrio's trust to maintain his value as an informant. *See id. at* 20.

---

[8] Tarrio's connection with a law enforcement would also impress his Proud Boys associates, who historically favor and liken themselves to law enforcement as "part of a trend of far right vigilantism where Proud Boys self-deputize in order to 'assist' law enforcement." *Proud Boys*, ALD, Dec. 11, 2023, https://www.adl.org/resources/backgrounder/proud-boys-0

The last portion of Bertino's testimony that the government asks the Court to admit is an audio call with Bertino and other Proud Boys. On the call, Tarrio said his "contact in D.C. told me they got the warrant." *Id.* at 21. When pressed by Bertino about whether it was Mr. Lamond, Tarrio confirmed "Yeah—Shane." *Id.* Here too, Tarrio had incentive to lie about his connection with law enforcement. He bragged to his associates that he had a contact in D.C. that told him about his warrant, and when Bertino asked him if it was Mr. Lamond, Tarrio took the easiest, self-aggrandizing route and affirmed.

Based on the totality of the circumstances, the Court should find the Bertino Statements are not very reliable under Rule 807. Not only did Bertino have incentive to lie in his statements to the FBI, but Tarrio, the subject of his statements, had considerable incentive to lie to Bertino and the Proud Boys to bolster is image as their leader.

### B.    Bertino's Statements Are Not Very Important or More Probative than Other Evidence

The Bertino Statements are not "more probative . . . than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807(a)(2). The government makes explicitly clear that Bertino is a cooperating witness. But it is unclear why he cannot testify to the statements in the instant matter.

### VI.    RULE 801(D)(2)(E) DOES NOT APPLY TO THE STATEMENTS TO BERTINO

The government cannot establish that Rule 801(d)(2)(E) applies because it cannot satisfy the requisite elements. The Rule allows admission of an out-of-court statement "made by the party's coconspirator during and in furtherance of the conspiracy." Statements are admitted under Rule 801 "if there is substantial evidence, independent of those statements that (1) a conspiracy existed, (2) the co-conspirator and the defendant against whom the statement is offered, were members of the conspiracy, and (3) the statements were made in furtherance of the

conspiracy." *United States v. Gantt*, 617 F.2d 831, 844 (D.C. Cir. 1980). Here, the government fails to establish any of these elements and thus has not satisfied its burden of demonstrating that the Bertino Statements should be admitted under Rule 801.[9]

### A.    The Government Presents No Evidence of a Conspiracy Because There Is None.

When a defendant objects to the admission of evidence under 801, "the district court must find by a preponderance of the evidence that a conspiracy existed[.]" *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006). There must be some independent evidence of a conspiracy. *Id.* In other words, the out-of-court statement alone cannot support the necessary finding that they were involved in a conspiracy. *See United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 187 (D.D.C. 2015) (finding a conspiracy existed "given the substantial evidence offered by the government beyond the contested out-of-court statements," where 10 text messages and 111 intercepted calls were available as non-hearsay co-conspirator statements). Even if the evidence shows a relationship more akin to friendship, "mere physical proximity and friendship—does not provide support for inferring [two individuals] 'had the specific intent to further [a] common unlawful objective.'" *United States v. Beckham*, 968 F.2d 47, 51 (D.C. Cir. 1992) (quoting *United States v. Tarantino*, 846 F.2d 1384, 1392 (D.C.Cir.1988)).  In *Beckham*, for example, the court did not apply the exception to coconspirator statements where the only evidence of a conspiracy was "the hearsay statement itself, Beckham's proximity to Monroe in

---

[9] For the reasons set forth in this Section, the government also failed to establish Tarrio's statements in the video clip were in furtherance of a joint enterprise to advance the Proud Boys agenda in D.C. The government did not address this argument and instead dropped a footnote. Mr. Lamond does the same. The reasons described in this Section establish that (1) Tarrio did not have a joint enterprise with the Proud Boys when he traveled to D.C. prior to his arrest; (2) Mr. Lamond was not somehow a part of that joint enterprise with the Proud Boys; or (3) that Tarrio learning from an unidentified male described in the video about a warrant was somehow in furtherance of any joint enterprise with the Proud Boys.

the yard, and their apparent acquaintance." *Id.* The court explained that because of those facts, there was "scant basis for inferring that [the two individuals] were joint venturers in a criminal enterprise or had any sort of prior agreement—the essence of conspiracy." *Id.*; *see also Dyer v. McCormick & Schmick's Seafood Restaurants, Inc.*, 264 F. Supp. 3d 208, 240-41 (D.D.C. 2017) (finding no conspiracy under Rule 801 because the movant "points to no evidence suggesting . . . a common agreement, enterprise, plan, or goal," where the movant relied primarily on an email the Court considered "at best, [] would show that one unnamed [] employee considered Dyer an undesirable employee"). Similarly, the government's evidence shows Mr. Lamond interacting with Tarrio as a typical law enforcement officer in the intelligence community would. *See* Motion at 6 (citing Mr. Lamond's text to Tarrio after President Biden won the 2020 Presidential Election that stated "Hey brother, sad, sad news today. You all planning anything?").  Like the evidence in *Beckham* and *Dyer* demonstrated that there was no shared common agreement, here the government offers no evidence that Mr. Lamond and Tarrio had any shared, common agreement.[10]

Further, there is no evidence of a conspiracy between Mr. Lamond and "other Proud Boys." *Id.* at 24. Indeed, the only evidence the government points to for this proposition is that Mr. Lamond shared cursory information with Tarrio to elicit the Proud Boys' plans as an informant and evidence that Mr. Lamond might share political views with the Proud Boys. *See id.* at 25 ("the Defendant telling Tarrio the day before a planned rally to contest the 2020 Presidential Election, 'I'm staying in D.C. tonight. Let me know if you go out and I may stop by.'"); *see also id.* ("the Defendant warning Tarrio that police may shut down a popular Proud Boys' meeting place down.").  But the government's evidence falls short of demonstrating Mr.

---

[10] Further, the Government offers no evidence to show a conspiracy exists under 18 U.S.C. § 1001(a)(2).

Lamond's intent to act in a shared common goal with the Proud Boys to prevent Tarrio from being arrested and, in fact, flies in the face of the truth. If Mr. Lamond let Tarrio know that there was a warrant, it is not a conspiracy if Tarrio then affirmatively comes into the District of Columbia to be arrested on a warrant that could only be effectuated in the District of Columbia. There is no unlawful purpose for Tarrio, rather, just the opposite if the government is to be believed. Coupled with the undisputed conduct of Mr. Lamond in his efforts to help locate Tarrio, identify Tarrio, and track Tarrio as he came into the District of Columbia, there is no evidence of an illegal purpose.

Tarrio, if he actually "knew" there was just a warrant (or even if he suspected), came into the District of Columbia intentionally, while Mr. Lamond spent his efforts assisting the arrest team with locating and arresting Tarrio as they soon did.[11]

### B.  The Government Presents No Evidence that Mr. Lamond and Tarrio were Members of a Conspiracy Because They Weren't.

Not only must the district court find by a preponderance of the evidence that a conspiracy existed, but the court must also find by a preponderance of the evidence that "the defendant and declarant were members of that conspiracy." *Gewin*, 471 F.3d, at 201. For example, in *Brockenborrugh*, the court explained that the parties were members of a conspiracy where one acted as a real estate agent for the other in certain real property transactions and they frequently worked together on other business-related ventures. 575 F.3d 726, 735-36 (D.C. Cir. 2009). In other words, the two were members of a conspiracy even though it was a "business relationship" because they were "acting in concert toward a common goal[,]" i.e., to do business or buy real

---

[11] Obviously, this would be an actual conspiracy if Mr. Lamond fed the information to Tarrio (which he did not) and Tarrio then avoided arrest in the District of Columbia by staying away. On a non-extraditable misdemeanor, all Tarrio had to do was avoid the District to avoid prosecution.

estate. *Id.* (holding a conspiracy existed where there was "overwhelming evidence" of a "business relationship to acquire property").

The government has no evidence that Mr. Lamond and Tarrio were members of a conspiracy. Unlike the business relationship in *Brockenborrugh*, here the government points to instances when Mr. Lamond "was providing Tarrio with confidential information" and asking him to keep information "between you and me." Motion at 24. But, this is the quintessential informant/law enforcement relationship where they are getting information from each other, not doing business together. The government also argues that Tarrio informed Mr. Lamond of certain Proud Boy activities, like their "plans in advance of the December 12, 2020, rally." *Id.* at 25. But, this interaction again does not demonstrate that Tarrio and Mr. Lamond were members acting toward a common goal; rather, they merely show Mr. Lamond asking Tarrio for details of his plans and sharing information with Tarrio to keep his trust. Even if their relationship evolved into friendship, *Beckham* instructs this fact alone is insufficient to support a finding of conspiracy. *Beckham* at 51.

The government also cites the Bertino Statements to emphasize the relationship between Mr. Lamond and Tarrio. *See* Motion at 26. But it takes two to tango. Tarrio might have considered Mr. Lamond as part of his organization, but Mr. Lamond acted with a different goal in mind, so they couldn't have been acting with a common goal or purpose. More importantly, Mr. Lamond was not acting corruptly or with the intent to delay or evade any proceeding. Even if correct, which they are not, that Mr. Lamond told Tarrio about a warrant, more is required.

While the parties here may dispute Mr. Lamond's judgement in his capacity as a law enforcement officer, he was acting appropriately to keep an informant content; a completely different objective than that of Tarrio and the other Proud Boys, so the two could not have been

members of a conspiracy when both had different goals with respect to their relationship. The government fails to establish a shared goal between Mr. Lamond and Tarrio and thus fails to establish they were members of a conspiracy.

### C.  The Bertino Statements Were Not Made in Furtherance of a Conspiracy.

If the Court finds a conspiracy existed and the relevant parties were part of that conspiracy, the Court must then determine whether the statements at issue were made in furtherance of the conspiracy. *Gewin*, 471 F.3d, at 201. The government also fails to establish the Bertino Statements were made in furtherance of a conspiracy "to obstruct the MPD Banner Burning Investigation." Motion at 24. Neither Mr. Lamond nor Tarrio were acting in furtherance of a conspiracy, as evidenced by the fact that Tarrio was arrested shortly after Mr. Lamond allegedly tipped him off. *Id.* Tarrio apparently knew about his arrest warrant, but intentionally travelled to the District of Columbia where he was arrested. Further, the government's evidence of Mr. Lamond's contact with Tarrio shows only the continuation of their informant relationship. Mr. Lamond was continuing his investigation as a law enforcement officer and attempting to garner information from his informant about a planned Proud Boys rally when he told Tarrio to let him know "if you go out and I may stop by." *Id.* at 25. The government demonstrates two individuals furthering separate, distinct, opposite goals, but claims they act in furtherance of a shared conspiracy.

Moreover, the government presents no evidence that Mr. Lamond acted in furtherance of a conspiracy "to advance the Proud Boys agenda in D.C." *Id.* In support of its claim, the government provides evidence that Mr. Lamond shared with Tarrio that the police "might shut down a popular Proud Boys' meeting place." *Id.* If true, this only establishes Mr. Lamond gave Tarrio a small piece of worthless information to gain his trust. There is no evidence Mr. Lamond

acted to help the Proud Boys as an organization and there is certainly no evidence he used any of the information he procured from Tarrio to further their objectives.

## I.   THE EVIDENCE AT ISSUE IS MORE PREJUDICIAL THAN PROBATIVE AND AT A MINIMUM, THE COURT SHOULD DELAY ITS RULING ON THE ADMISSION OF EVIDENCE UNTIL TRIAL

Even if the Court agrees with the government that the evidence at issue should be admitted, the "evidence may be deemed inadmissible and subject to exclusion on multiple grounds, including that 'its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'" *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 175 (D.D.C. 2015), aff'd, 902 F.3d 285 (D.C. Cir. 2018). Here, the admission of the evidence at issue would significantly prejudice Mr. Lamond. Tarrio and the other Proud Boys are incredibly polarizing figures, especially in D.C. where many of them have both congregated and faced trial for egregious crimes that Lamond had nothing to do with.  The admission of evidence that includes Tarrio calling Mr. Lamond "my guy" or "my fed" would at minimum confuse or mislead the jury to inextricably link Mr. Lamond with an extremist organization and its divisive ideals.[12] *See* Motion at 26.  Further, admitting this evidence under Rule 801 would prejudice Mr. Lamond if the jury believes he and Tarrio are in a conspiracy for which they are not charged. This is not a January 6th case and the government is hoping to make it one with this proposed evidence. The alleged conspiracy ends on January 4th with Tarrio's

---

[12] Tarrio's sentencing received widespread media coverage. *See* David A. Graham , *The Former Proud Boys Leader Finds Out*, THE ATLANTIC, Sept. 5, 2023, https://www.theatlantic.com/ideas/archive/2023/09/enrique-tarrio-proud-boys-finds-out/675230/. The January 6 events are linked to symbols of hate and far-right extremism. *See also,* Deena Zaru, *The symbols of hate and far-right extremism on display in pro-Trump Capitol siege*, ABC NEWS, Jan. 14, 2021, https://abcnews.go.com/US/symbols-hate-extremism-display-pro-trump-capitol-siege/story?id=75177671

arrest for the flag burning. None of the indefensible, anti-American, insurrectionist conduct of Tarrio and his followers is relevant to the instant case.

At a minimum, the potential prejudice to Mr. Lamond warrants a delay in admission "contingent upon the government's subsequent introduction of sufficient evidence to persuade the court that the requirements of Rule 801(d)(2)(E) have been met." *See U.S. v. Loza*, 763 F. Supp. 2d 108, 112 (D.D.C. 2011) ("Although the necessary factual findings relevant to admissibility must be made by the court before a statement may be admitted unconditionally in evidence pursuant to Rule 801(d)(2)(E), [citation omitted] the Court need not [decide] before the government presents its evidence to the jury."); *see also United States v. Mosquera-Murillo* at 175 ("Depending upon the nature of the evidentiary issue presented in a pretrial motion in limine, the court must also assess whether a ruling is appropriate in advance of trial or, instead, should be deferred until trial '[when] decisions can be better informed by the context, foundation, and relevance of the contested evidence within the framework of the trial as a whole.'") (quoting *Herbert v. Architect of the Capitol*, 920 F.Supp.2d 33, 38 (D.D.C.2013)).  To that end, if the Court does not agree that the evidence is barred by Rule 403, the Court can and should consider waiting to admit the evidence at issue.

## VII.    CONCLUSION

For the foregoing reasons, Mr. Lamond respectfully requests this Court deny the government's motion *in limine*, exclude the inadmissible and unreliable proposed testimony, and permit Mr. Lamond to have a trial on the merits and the evidence and not supposition and prejudice.

Date:  January 8, 2024                         Respectfully submitted,

 /s/ Mark E. Schamel
Mark E. Schamel (Bar No. 463965)
Venable LLP
600 Massachusetts Ave NW
Washington, DC 20001
Tel: (202) 344-4631
Fax: (202) 344-8300
Email: meschamel@venable.com

*Counsel for Defendant Shane Lamond*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 8, 2024, I caused a copy of the foregoing to be sent via the Court's CM/ECF system to all counsel of record.


      /s/ Mark E. Schamel       
Mark E. Schamel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No.: 1:23-cr-00177-ABJ |
| | ) | |
| SHANE LAMOND, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER</u>

UPON CONSIDERATION of the United States' Motion to Admit Certain Evidence Pursuant to Federal Rules of Evidence 807 and 801(d)(2)(E) ("Motion"), Defendant Shane Lamond's Opposition thereto, and any reply, it is this _____ day of ____, 2024:

ORDERED that the Motion is DENIED; [OR]

ORDERED that a ruling on the Motion is held in abeyance until trial where counsel for the government can renew its motion and counsel for Defendant can renew objections, and the Court will decide the Motion then; and it is

SO ORDERED.


Dated: _____

_____
The Honorable Amy Berman Jackson
United States District Judge