**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | **Criminal No.: 1:23-cr-00177-ABJ** |
| ) | |
| **SHANE LAMOND,** ) | |
| ) | |
| **Defendant.** ) | |

## SHANE LAMOND'S MEMORANDUM IN AID OF SENTENCING

There is no argument or rationale that justifies the incarceration of Shane Lamond. Instead, Mr. Lamond respectfully requests that this Court find probation to be an appropriate sentence.

A father, veteran, and dedicated career officer with the District of Columbia Metropolitan Police Department ("MPD"), Shane Lamond came into contact with Enrique Tarrio, the Proud Boys, and other far right groups while performing his duties as the Lieutenant overseeing MPD's intelligence section. Before January 6, 2021, MPD was dealing with massive demonstrations where violence often broke out, and Mr. Lamond testified – and this Court did not disagree – that Mr. Lamond's focus was on collecting vital intelligence from a reliable source that was critical to prevent violence and protect demonstrators, law enforcement, and citizens. Despite the government's arguments, Mr. Lamond's actions were not an egregious obstruction, betrayal, or anything of the sort. As the MPD officers who testified in support of the government's case noted, Mr. Lamond was still helpful during the Black Lives Matter ("BLM") flag burning investigation and Mr. Lamond contributed significantly to the successful arrest and prosecution of Mr. Tarrio. Even if the government were correct in its various assumptions, Mr. Lamond's actions do not warrant incarceration. Contrary to the hyperbole used throughout the trial and the government

sentencing memorandum, there is nothing in this case that risks officer safety or even jeopardizes the integrity of the banner burning investigation. Mr. Lamond gained nothing from his communications with Mr. Tarrio and only sought, albeit in a sloppy and ineffective way, to gain information and intelligence that would help stop the violent protesters coming to D.C. in late 2020, early 2021. For the reasons that follow, Mr. Lamond respectfully asks this Court to sentence him to probation.

**BACKGROUND**

As the Court is fully aware, Mr. Lamond was in contact with Mr. Tarrio as the supporters of then President Donald Trump faced re-election in 2020, and in particular, after the challenge to President Joseph Biden's victory.

Mr. Lamond and Mr. Tarrio had extensive contact leading up to the post-election protests in Washington, D.C. in December 2020 which resulted in the burning of a BLM banner by members of the Proud Boys. The two remained in contact following the BLM banner burning and leading up to Mr. Tarrio's arrest on January 4, 2021. There is no dispute that Mr. Lamond and Mr. Tarrio were in regular contact or that Mr. Lamond was instrumental in gathering information about the plans of Mr. Tarrio and the Proud Boys. Nor is there dispute that Mr. Lamond assisted with collecting evidence that was used to obtain the arrest warrant for Mr. Tarrio. As was learned from the trial testimony, Mr. Lamond was the officer responsible for bringing Mr. Tarrio's confession(s) to the attention of MPD, identifying Mr. Tarrio in the photos of the banner burning, identifying Mr. Tarrio's voice in podcasts and interviews confessing to the banner burning, and coordinating Mr. Tarrio's travel on the day of his arrest in D.C.

With the benefit of hindsight, Mr. Lamond could have done better. He could have more attentively memorialized and communicated with his chain of command about his contact with

Mr. Tarrio. He also could have done a better job when he was confronted by federal agents about that contact.

Mr. Lamond now stands before the Court, having been found guilty of making three false statements and obstructing the investigation into him and his contact with Mr. Tarrio. Every possible inference and assumption that could be made regarding those contacts has been made against him and now, inexplicably, the government seeks a four (4) year prison sentence. At every step, the government tried to turn this case into something it is not. In what appears to be a first, the government charged Mr. Lamond with a Superior Court obstruction charge and argued a statutory minimum of at least three years on that charge, a blatant attempt to make this case more serious and convince the Court to imprison this 23-year veteran whose career, reputation, and life have already been destroyed. A case that would typically call for a Zone A, 0-6 month sentence, is now being pushed for almost half a decade in prison.

This sentence and this recommendation are nonsensical. There is no legitimate reason under the Advisory Sentencing Guidelines or 18 U.S.C. § 3553 that Mr. Lamond should be incarcerated, even if the Court were to believe every one of the arguments put forward during this prosecution. And, even if Mr. Lamond told Mr. Tarrio more than he should have as an officer in the intelligence section trying to work a source, Mr. Lamond is not accused of assisting a violent criminal abscond from justice or avoid prosecution. On the contrary, the mistakes that Mr. Lamond made were related to a ***misdemeanor*** destruction of property that resulted in a quick plea and jail sentence for Mr. Tarrio. That result would not have been possible without Shane Lamond.

***Count 1 - Mr. Lamond did not obstruct justice; he promoted it by enabling Mr. Tarrio's arrest.***

Mr. Lamond did not interfere with the investigation into the banner burning in any way. Asking Mr. Tarrio which number MPD should use to contact him did not impede the investigation. Mr. Tarrio had already confessed in multiple formats, which Mr. Lamond had brought to the MPD investigators. When the investigator ultimately sent a text message (not a phone call) to Mr. Tarrio, there was no loss of "surprise" or investigative ability. While the Court has found that Mr. Lamond shared more than he should have, there was never any confidential, sensitive, or important information in the communications between Mr. Lamond and Mr. Tarrio.

The banner burning was a very public investigation, initiated by both FBI and MPD press releases, twitter and other social media announcements, and flyers seeking information about the identity of those involved. Despite the questionable tactics of sharing his opinions about the propriety of a "hate crime" enhancement, all of those discussions were in the public forum from the moment MPD and the FBI issued their press releases with that exact language.

While counsel has a very different view of the evidence and the testimony offered at trial, particularly the testimony from the only two (2) people who actually know what transpired between Messrs. Lamond and Tarrio, it is clear that the Court has viewed every interaction and communication between the two men through a lens of disbelief. Despite Mr. Tarrio clearly and repeatedly admitting to the content of the communications, while refusing to endorse the collection methods and evidence presented by the government, the Court viewed Mr. Tarrio as the worst witness ever to testify before it. Mr. Tarrio, who has a history with the Court and a course of conduct that is not endorsed by counsel, was truthful. Though he was combative, condescending, and uncooperative on the witness stand, he did not lie. Nor did Shane Lamond.

Mr. Lamond's police intel work certainly strayed from the ideal. But he did not impede the investigation in any way, and was the most significant source of information used to successfully prosecute Mr. Tarrio.[1]

**Count 2 - "It was more, you know, one-sided with just him telling me, you know what their plans were."**

The Court found that it could divine what Mr. Lamond meant when he answered this question. The government believes and the Court agreed that when Mr. Lamond answered the question about "would it be common for him to fish?" that Mr. Lamond's answer was intentionally false and material. "He never really asked me questions about, like, you know, what we were doing or anything," was, according to Mr. Lamond, a truthful answer to the question asked. It certainly had nothing to do with the investigation into the banner burning investigation. And while the government maintains that it was false, only Mr. Lamond knows what he meant. It is accurate when viewed in the context of that question and answer, not as the government has done by juxtaposition over the entirety of every communication. This is not an objective fact that Mr. Lamond knew was wrong and intentionally misstated. Further, the investigation into Mr. Tarrio was well over at the time of this interview and Mr. Tarrio would plead guilty just a few weeks later.[2]

---

[1] The government offered no evidence, not even a proffer, that there was an open investigation into any other alleged banner burner at the time of the June 2nd interview of Mr. Tarrio. Contextually, the interview was far more focused on Mr. Tarrio, the Proud Boys, and their role in the January 6th storming of the U.S. Capitol. Questions related to the Tarrio/Lamond relationship were seemingly more focused on their interactions, which makes sense as the government was putting together its case against Mr. Tarrio for insurrection and Mr. Tarrio ultimately put Mr. Lamond on his witness list to try to establish that he was helping the government and not conspiring to overthrow it.

[2] It is hard to credit the government argument that this statement, if materially false, would impact the then completed investigation of Mr. Tarrio for his role in the banner burning and it would certainly not apply to any investigation into any other Proud Boy or other individual who may

### Count 3 - *"without tipping him off to the MPD investigation."*

When Mr. Lamond told agents investigating the banner burning that he was trying not to tip Mr. Tarrio off, he was neither intentionally nor knowingly lying to the agents or trying to obstruct the completed investigation into Mr. Tarrio's involvement in the banner burning. Clearly, Mr. Tarrio knew about the investigation, as it had been plastered all over social media and conventional media. Mr. Lamond had gotten information directly from Mr. Tarrio to assist in the investigation, and provided that information to his fellow MPD officers, enabling them to successfully obtain a warrant for Mr. Tarrio's arrest. Mr. Lamond explained his view of this statement and that he did not tell Mr. Tarrio anything he thought was valuable or useful when talking to him. It is important to remember that even Mr. Lamond's supervisor, Assistant Chief Carroll, knew that Mr. Lamond was assisting in the investigation and talking to Mr. Tarrio, having specifically asked Mr. Lamond to ask Mr. Tarrio if he knew any of the people in the MPD flyer when Mr. Lamond met with Mr. Tarrio in person following the banner burning.[3]

The government has chosen to believe that "not without tipping him off to the MPD investigation" is false because of the discussions that Mr. Lamond and Mr. Tarrio had about the hate crime enhancement and Mr. Lamond's commentary about other discussions. The Court has accepted that argument, but that does not mean that is what Mr. Lamond meant when he said it. Again, this was a subjective view and not an objective fact. The government believes it means one thing. But Mr. Lamond, the only person who could truly know what he meant, said it means

---

have played a role in the banner burning. Certainly, no connection was ever offered demonstrating how these statements would be material to that hypothetical investigation.

[3] This meeting again only involved two people: Mr. Lamond and Mr. Tarrio. Both of whom were crystal clear in their testimony that Mr. Tarrio never confessed to Mr. Lamond that he had burned the banner. This is uncontroverted and was unimpeached at trial.

something different. The Court has chosen, as it has with every judgment call related to Mr. Lamond's conduct, to assign a negative connotation to Mr. Lamond. The Court believes that the evidence demonstrates not just inartful and sloppy questions and even more inartful and sloppy answers, but intentional deception.

The findings have been made, and though the defense disagrees with the conclusions, reality remains the same; these statements, even if intentional, did nothing to impede or interfere with the then-closed investigation of Mr. Tarrio and certainly did nothing to interfere with his plea shortly thereafter. It may have minimized a too chummy and too chatty relationship between a poorly trained intel officer and a source, but it certainly does not demonstrate a police officer trying to impede or interfere with an investigation. In fact, knowing everything that Mr. Lamond was doing to assist in the investigation, it is a mistake to look at this statement as an attempt to obstruct,[4] and it was certainly not an intentional material misstatement.[5]

### Count 4 - "didn't, you know, inform [Tarrio] that he had an arrest warrant."

The final alleged material false statement is one of the few objective facts offered in the government's case against Mr. Lamond for obstruction where he is alleged to have used his position to "learn sensitive law enforcement information related to a crime in the District, and then lead the information he learned to the person he knew committed that crime." Dkt. 105 at 1. Here, despite no actual proof of the alleged statement and the unimpeached testimony of the only two

---

[4] This statement, despite the other arguments made by the government, could not impact any investigation into any other potential defendants for the banner burning. It was only in relation to Mr. Tarrio, it was six months after the investigation into Mr. Tarrio was completed, and it was on the eve of Mr. Tarrio's plea, thus of questionable materiality to any investigation.

[5] There is also a question, given the timing of the interview on June 2, 2021, six months after Mr. Tarrio's arrest and a mere few weeks before his plea, if this interview was even tethered to the investigation of the banner burning.

people who would know, Mr. Tarrio and Mr. Lamond, the Court has found that Mr. Lamond told Mr. Tarrio that there was a warrant. This statement was allegedly made not during the multiple communications in the days leading up to Mr. Tarrio's January 4th travel to the District, but while Mr. Tarrio was on the flight headed into DCA.

The government outrageously argues that Mr. Lamond waited until Mr. Tarrio was on the plane and could not turn back, a preposterous, nonsensical statement given that the warrant was not enforceable until Mr. Tarrio entered the District. The government chooses to use Mr. Tarrio's statements from the plane that the "warrant was just signed" when the fact is it was not. It had been signed days before. Mr. Lamond knew that and never told Mr. Tarrio. Mr. Tarrio certainly suspected it and had planned for it. Following his multiple confessions in multiple media outlets and mediums, Mr. Tarrio purchased a ticket to come to D.C. early to surrender. In fact, the evidence is clear that Mr. Tarrio booked his travel before the warrant was even presented and told his various friends and followers that he was going to D.C. early because of the warrant he expected and wanted.

Indeed, Mr. Tarrio, who admitted to being less than candid with his followers had wanted to make a "big show" of his arrest and planned a "circus" for a trial. Yet, because he was not told by anyone and because he did not know the law, he came into the District with an illegal magazine for a firearm and exposed himself to a felony. This is not the conduct of a man who was being warned or protected by a police officer.

More importantly for the Court's analysis, this is the only objective fact about which Mr. Lamond is alleged to have made a material misstatement. A statement on June 2nd about whether Mr. Tarrio knew the warrant had been issued when he was arrested six months earlier in an investigation that was done, as it related to Mr. Tarrio. But without any direct evidence, without

any impeachment on this specific exchange, and with only the generalized view that neither Mr. Lamond nor Mr. Tarrio were reliable and credible witnesses, the Court found that this was also a materially false statement.

## ARGUMENT

Setting aside Mr. Lamond's disagreement with this Court's findings, Mr. Lamond respectfully requests that he be sentenced to probation for the following reasons: (1) D.C. Code § 22-722 does not require a mandatory or statutory minimum prison sentence; and even so, the sentence could be suspended; (2) when analyzing the factors under 18 U.S.C. § 3553(a) and applicable law, the Court should find against imprisoning Mr. Lamond and order him to a sentence of probation.

## I.    D.C. Code § 22-722 Imposes Neither a Mandatory nor Statutory Minimum Sentence, Contrary to the Government's Claim

The Government insists Mr. Lamond's conviction under D.C. Code § 22-722 requires he be sentenced to at least three years in prison. But the text of that statutes contains no such mandatory minimum language, and this Court should not read one in here.

D.C. Code § 22-722(b) reads in relevant part: "Any person convicted of obstruction of justice shall be sentenced to a **maximum** period of incarceration of not less than 3 years and not more than 30 years, or shall be fined not more than the amount set forth in § 22-3571.01, or both." (emphasis added). On its face, the statute provides for a *maximum* sentence of between three and thirty years, not a *minimum* of the same. And when courts interpret statutes, they begin with the plain meaning of the statute's text. *Babb v. Wilkie*, 589 U.S. 399, 404 (2020). If that plain meaning is sufficient, the court need look no further. *Id*. Here, the text plainly provides that the *maximum* potential sentence is between three and thirty years. It says nothing about a *minimum* sentence,

much less a *mandatory minimum* sentence. This alone should end the Court's inquiry into the Government's erroneous position.[6]

But if the Court goes further, cannons of statutory interpretation and the legislative history behind the statute also support there being no mandatory minimum. Indeed, the Government's reading of the statute would omit the crucial term "maximum" all together, violating the cannon of surplusage. *See Qi-Zhou v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995) (describing the cannon as the "endlessly reiterated principle of statutory construction . . . that all words in a statute are to be assigned meaning, and that nothing therein is to be construed as surplusage."). And it is not as though the D.C. Council is unable to draft a clear mandatory minimum. D.C. Code § 22-2106 imposes one for those convicted of murder of a law enforcement officer by saying such defendants "shall be sentenced to life without the possibility of release." D.C. Code § 22-2803(b)(2), punishing armed carjacking, provides that the defendant be imprisoned "for a mandatory-minimum term of not less than 15 years." D.C. Code § 22-2104(a), punishing first degree murder, says the punishment for that offense "shall be not less than 30 years." In each case, the D.C. Council's language is clear – and meaningfully different from the language of § 22-722.

The same is true for the so-called "statutory minimums" that the D.C. Voluntary Sentencing Guidelines Manual describes as including § 22-722. Other examples of these statutory minimums include D.C. Code § 22-301, arson, which gives the sentence as "not less than 1 year nor more than 10 years"; D.C. Code § 22-401, assault with intent to rob, sentencing convicted defendants to "imprisonment for not less than 2 years or more than 15 years"; D.C. Code § 22-1510, making bad checks over $1,000, with provides for imprisonment "for not less than 1 year

---

[6] It is an interesting change that the government now argues for a mandatory minimum, but when questioned during pretrial hearings and a discussion of a potential plea offer, the government confirmed defense counsel's position that this charge does not have a mandatory minimum.

nor more than 3 years"; and D.C. Code § 22-801(a), first degree burglary, punishable by imprisonment "for not less than 5 years nor more than 30 years." In each of these statutes, the permissible sentencing range is defined as "not less than" a minimum period "nor more than" a maximum period. And while § 22-722 does provide for a term of imprisonment of "not less than 3 years and not more than 30 years," this is the *maximum* term, not the *only* term as is the case in the other statutory minimum sentencing provisions.

For more evidence that § 22-722 is not a mandatory or statutory minimum, the legislative history is helpful. When enacted in 1982 as a part of the D.C. Theft and White Collar Crimes Act (D.C. Law 4-164),[7] the provision provided for a prison sentence of "not more than 3 years," making a statutory maximum, not minimum. In 1992, the Law Enforcement Witness Protection Amendment Act (D.C. Law 9-268)[8] imposed a statutory minimum almost identical to those in other places of the Code by providing for imprisonment "for not less than 3 years nor more than 10 years." But in 1994, the Public Safety and Law Enforcement Support Amendment Act (D.C. Law 10-256)[9] once again changed the sentencing provision, this time to provide for a "**maximum** period of incarceration of not less than 3 years and not more than life." (emphasis added). While later amendments changed the maximum of life to 30 years, nothing else changed the language of the "maximum period of incarceration." And in the D.C. Council Report on Bill 9-385, what would go on to be the Public Safety and Law Enforcement Support Amendment Act, the Council

[7] *District of Columbia Theft and White Collar Crimes Act of 1982,* Counsel of the District of Columbia (Dec. 1, 1982), https://code.dccouncil.gov/us/dc/council/laws/docs/4-164.pdf.

[8] *Law Enforcement Witness Protection Amendment Act of 1992*, Counsel of the District of Columbia  (May 7, 1993), https://code.dccouncil.gov/us/dc/council/laws/docs/9-268.pdf.

[9] *Public Safety and Law Enforcement Support Amendment Act of 1994,* Counsel of the District of Columbia  (May 23, 1995), https://code.dccouncil.gov/us/dc/council/laws/docs/10-256.pdf.

described the change as going from "a minimum of 3 years imprisonment to a term of 3 to 10 years'[10] imprisonment." This was meant to "more closely comport" the sentencing statute with those of neighboring Maryland, with a 3-year maximum prison sentence, and Virginia, with a 10 year maximum prison sentence. In context, where the Council previously had a statutory minimum sentencing scheme and intentionally changed it by adding the word "maximum" into the provision with the stated purpose of aligning to Maryland and Virginia, neither of whom had a minimum sentence of three years for an obstruction charge, this Court should read that change as important. The plain language, its comparison to other statutes, and the legislative history behind § 22-722 all betray the idea that the statute carries a minimum sentence, be it mandatory or statutory, of three years.

Indeed, the only source that describes § 22-722 as having a statutory minimum sentence of three years is the D.C. Voluntary Sentencing Guidelines Manual. It cites no authority for that position, and to counsel's best efforts, no cases exist which confront § 22-722's sentencing provision to offer guidance on whether the provision is a mandatory or statutory minimum. And where the Voluntary Guidelines themselves acknowledge they are just that—voluntary—and not something which judges are required to follow, this Court can and should look beyond them and to the law itself to find § 22-722 imposes no minimum sentence requirement. *See* DCVSG §§ 1.2.1 ("The Guidelines are voluntary. This means that judges are not required to follow them.") *and* 5.3 ("There are no sanctions for failing to follow the Guidelines and any lawful sentence is not appealable based on whether or not it complies with the Guidelines").

II.    **Even If § 22-722 Imposes a Minimum Sentence, That Sentence Can and Should Be Suspended**

---

[10] That 10-year maximum would be increased by amendment to life.

Yet, even if this Court determines that § 22-722 does require it to impose a minimum sentence of three years, that sentence can be properly suspended in its entirety under the Voluntary Guidelines.[11] Indeed, the only sentences which cannot be suspended under the Voluntary Guidelines are mandatory-minimum sentences, a full list of which is provided at DCVSG § 3.5. Violations of § 22-722 are not among those mandatory-minimum sentences, and thus suspension is appropriate for sentences under the statute. *See* DCVSG § 3.5 ("Some offenses have a minimum that is **not** a mandatory minimum. For these offenses, the Court must impose at least the statutory minimum, but the sentence that is imposed may be suspended, in whole or in part in a shaded box.") (emphasis in original).

Appendix E of the Voluntary Guidelines describes the process by which to suspend a sentence, given the unique overlap of probation and supervised release in the District. First, the Court should sentence to at least the minimum term of imprisonment and all supervised release as required by the statute. *See* DCVSG Appx. E. Then, the Court can suspend as much time as it does not want the defendant to actually serve along with all of the supervised release time. *Id.* Finally, the Court can set a term of probation appropriate to the circumstances. *Id*. The suspension of the supervised release is necessary to ensure jurisdiction remains with the Court during the period of probation, not also with the Parole Commission. *Id*. The Court here can do exactly that, should it find § 22-722 requires a three-year prison sentence, by imposing those three years, suspending it and the five-year supervised release called for by the Voluntary Guidelines and applicable statutes, and sentencing Mr. Lamond to a period of probation sufficient to ensure he does not reoffend.

### III. Section 3553(a) and Applicable Law Weigh In Favor of Probation and Against a Prison Sentence

---

[11] The government agrees that the Court may suspend any period of incarceration.

To sentence a defendant, the district court begins with the sentencing guidelines, although they are not binding, and then turns to the arguments of the parties and the factors in 18 U.S.C. § 3553(a). *See Peugh v. United States*, 569 U.S. 530, 536 (2013). But a sentencing court shall not "presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). In contrast, consistent with the requirements of 18 U.S.C. § 3553(a), the court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and must make an "individualized assessment," *Gall v. United States*, 552 U.S. 38, 50 (2007), in imposing a sentence that is "sufficient, but not greater than necessary" to achieve the purposes set forth in 18 U.S.C. § 3553(a)(2). The sentence should be adequate, pursuant to § 3553(a)(2): "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Each of these factors weighs against Mr. Lamond receiving a term of incarceration and instead demonstrates that Mr. Lamond should receive a sentence of probation.

### a.  Nature and Circumstances of the Offense

The offenses here (obstructing justice by Mr. Lamond telling information to Mr. Tarrio about the misdemeanor BLM banner investigation and then lying to federal officials about it) do not warrant imprisonment. First, there are no victims here. Mr. Lamond did not injure or physically harm anyone or anything during the commission of the crimes. That is what the D.C. Code sought to prevent when it was enacted. *See supra* Section I, n. 7, 8, & 9 (citations to legislative history discussing how in the 1980's and 1990's in D.C., civilians were being threatened, assaulted, and

14

even gunned down in the street for cooperating with police and how this statute was meant to protect against such conduct). Mr. Lamond did not financially ruin anyone. Arguably, the only person Mr. Lamond hurt in the commission of these crimes was himself, losing his job, his reputation, the trust of his former colleagues, and his savings.

Second, even if the crimes happened exactly as the government and this Court believe, the crimes—at most—hurt the public's ability to trust the police. But that trust in the police will not be rehabilitated if the public sees Mr. Lamond go to prison. The trust in the police may be restored if MPD changed policies to be clear in how to treat confidential information or how to treat both a suspect and intelligence informant during an investigation. But sentencing Mr. Lamond to prison will do nothing to help in this restoration because Mr. Lamond is no longer a police officer. He no longer has access to intelligence. He no longer runs or participates in any investigations. He cannot reoffend.

Third, Mr. Lamond learned through this case that his sloppy work and inattention to detail cost him everything. As the probation report notes, Mr. Lamond has very little financially to support himself, let alone to pay any sort of fine or fee. He has been destroyed by the press for his relationship with Mr. Tarrio and this criminal case. He has lost friendships and some of his support system because of this case. Mr. Lamond should not have to suffer more, and these facts mitigate against a prison sentence.

Nevertheless, the government claims there are two aggravating factors here. First, the government relies on U.S.S.G. § 3B1.3 to claim that there should be a sentencing enhancement for abuse of position of trust. To impose such an enhancement, the Court must determine "(1) whether the defendant occupied a position of trust; and (2) whether the defendant abused that position in a

manner that significantly facilitated the commission or concealment of the offense." *United States v. West*, 56 F.3d 216, 219 (D.C. Cir. 1995).

To determine whether the defendant held a position of trust, the Court may look to the extent to which the position provides "the freedom" to commit a wrongdoing unnoticed; the Court can also consider the defendant's duties compared to those of others; the defendant's level of specialized knowledge; his level of authority; and the level of public trust. *United States v. Robinson*, 198 F.3d 973, 977 (D.C. Cir. 2000) (*quoting United States v. Shyllon*, 10 F.3d 1, 5 (D.C. Cir. 1993)); *see, e.g., United States v. Smaw*, 22 F.3d 330, 332 (D.C. Cir. 1994) (finding no position of trust where defendant was the time and attendance clerk at the Federal Trade Commission who fraudulently got credit cards in fellow employees' names by using the names and personal data of those employees that she had access to through her job). Here, Mr. Lamond did not have the freedom to commit a crime unnoticed: he had to check in with his supervisors repeatedly to the extent that one even asked him to meet with Mr. Tarrio and that very meeting is now one the government claims Mr. Lamond slipped Mr. Tarrio information; his supervisors knew Mr. Tarrio was a source of Mr. Lamond's; and Mr. Lamond used a government-issued phone for all of his conversations with Mr. Tarrio. Mr. Lamond's duties were the same as other police officers collecting intelligence: he had a chain of command he had to report through; he shared his sources with that chain of command; and he shared the intelligence he received with his fellow law enforcement officers, just as others in the intelligence division did. *See, e.g.,* Letters from Justin Scanlon, Daren Demarco, and Ben Santamaria, attached hereto as Ex. 1. Mr. Lamond did not have any specialized knowledge, as he testified that he never received any specialized training to be an intelligence officer, and no one refuted that testimony. Mr. Lamond also did not have a position of authority, though he supervised some officers, he was supervised by several others and low in the

chain of command. And, at the time Mr. Lamond was collecting intelligence for MPD, there was already significant public mistrust of the police given the death of George Floyd and resulting massive protests across the country and in the District.

With respect to whether Mr. Lamond significantly facilitated the commission or concealment of the offense, he did not. To the extent that Mr. Lamond shared information with Mr. Tarrio about the BLM investigation, all of that information was either publicly available or would become publicly available and did not jeopardize any subsequent police investigation. Indeed, several officers testified that Mr. Lamond actually helped the investigation. And, to the extent that Mr. Lamond then lied to federal officials, that did not significantly facilitate the commission of the offense. Even if he had told Mr. Tarrio anything about the BLM investigation, it had happened months before; in effect, the damage was already done. Further, any lie he told to federal officials could not significantly conceal what he told Mr. Tarrio because he had worked with Mr. Tarrio for years and relayed what he remembered to the best of his ability. Mr. Lamond also turned over his phone once he spoke to his supervisor (because, again he couldn't do anything without his supervisor's approval), and he cooperated with the federal officials. This enhancement should not apply,

The next enhancement is obstruction of justice. Here, the government claims that this adjustment applies where, as here, "there was a significant further obstruction that occurred during the investigation and prosecution" because Mr. Lamond allegedly lied to the Court when he testified. *See* USSG § 3C1.1, n.7. But the Guidelines go on to describe an example of a "significant further obstruction" to be "*e.g.,* if the defendant threatened a witness during the course of the prosecution for the obstruction offense." *Id.* While the Guidelines suggest that this enhancement should only apply in cases where witnesses are threatened or killed (just as the D.C. Code statute

applies), the D.C. Circuit has permitted this enhancement in a perjury case where the defendant lied under oath about whether she perjured herself. *See United States v. McCoy*, 316 F.3d 287, 289 (D.C. Cir. 2003). Here, Mr. Lamond is not charged with perjury and the Court did not claim he perjured himself; rather, the Court did not credit Mr. Lamond's explanations for why he believed he was not lying to the federal officials. This distinction matters and accordingly, this enhancement should not apply.

Without any enhancements, the Court is left where this section began. Mr. Lamond respectfully requests the Court order probation as his sentence.

### b.  History and Characteristics of Mr. Lamond

Mr. Lamond is the father of two grown children and the son of an 82-year-old mother who is fighting multiple health issues. *See* Letters from Mikayla Lamond (explaining Mr. Lamond as a father) and Megan Lamond (Mr. Lamond's other daughter describing how he tried to be at every family event, including running to her graduation from his arraignment) and Nicole Lamond (Mr. Lamond's sister describing the care Mr. Lamond gives to his mother), all attached hereto as Ex. 2. Mr. Lamond accompanies his mother to her medical appointments, takes on the responsibilities of maintaining the family home, and handles everyday tasks for his mother. *See id.* at letter from Nicole Lamond. Mr. Lamond cares deeply for his family as is evidenced by the letter from his ex-wife, Brooke Lamond. *See* Letter from Brooke Lamond, attached hereto as Ex. 3. Ms. Lamond describes how she was diagnosed with Stage IV Hodgkin's Lymphoma fairly early in their relationship, but Mr. Lamond did not waiver. He stayed with her, never missed a treatment or doctor's appointment despite his demanding schedule as a police officer, and moved in to take care of her. *Id.* She describes how, during this time, he also took care of her children by taking them to school and extracurricular activities, taking care of the family home, and answering questions the

kids had. *Id.* Mr. Lamond no doubt sacrificed a lot for his career, a career that ended with this indictment. *See* Letter from Mikayla Lamond. He sacrificed because he loved being a police officer. *Id.*; *see also* Letter from Carolyn Montagna attached hereto as Ex. 4. He sacrificed because he cared, and still cares, about taking care of others. *See* Letter from Carolyn Montagna (describing recent incident where Mr. Lamond tried to help a woman with a flat tire). Mr. Lamond did not intend to obstruct justice when he communicated with Mr. Tarrio. Mr. Lamond did not want to throw away his entire career because he was communicating with Mr. Tarrio. Not after Mr. Lamond sacrificed so much. What Mr. Lamond wanted to do was care for the city he served for 23 years; he wanted to provide this city with intelligence to potentially try to stop what happened on January 6, 2021, by giving intelligence officers important information directly from the leader of the Proud Boys. *See* Letters from Justin Scanlon, Daren Demarco, and Ben Santamaria. Could he have accomplished this goal better? Yes. *See* Letter from Matthew J. Bromeland attached hereto as Ex. 5 (describing how Mr. Lamond did a sloppy job here but how he served the force for 20+ years honorably). For that, Mr. Lamond is truly sorry. But now, Mr. Lamond has lost this job he sacrificed so much for; he is taking care of his sick mother; and he is trying to continue to be a loving father and brother. But he is financially ruined and reputationally ruined after being decimated in the press. Mr. Lamond respectfully requests that the Court not add prison to this list and find that probation is sufficient for his sentence.

### c.   Need to Promote Respect for the Law, Provide Just Punishment, Protect the Public, and Afford Adequate Deterrence

Mr. Lamond understands that this Court must consider respect for the law and to provide a just punishment. He would request that this Court consider the cases of Michael Riley and

Michael Frederiksen.[12] While Mr. Lamond understands this Court is familiar with Mr. Riley's case after sentencing him to two years of probation and four months of home detention, Mr. Lamond would be remiss not to point out the similarities in his case to Mr. Riley's. Mr. Riley was a capitol police officer convicted of obstruction of justice (albeit federal) for helping a rioter on January 6th avoid criminal charges, just as Mr. Lamond was convicted of helping Mr. Tarrio try to avoid criminal charges for the BLM flag burning. Mr. Riley, like Mr. Lamond, is alleged to have deleted messages he had with the rioter on Facebook ahead of the grand jury, just as Mr. Lamond is alleged to have deleted messages with Mr. Tarrio ahead of the police investigation into the BLM banner burning. Mr. Lamond requests that this Court consider the same sentence for him.  Similarly, Michael Frederiksen was a state trooper convicted on one count of making false statements (Mr. Lamond understands that he was convicted of three charges but the sentence would remain similar) to the FBI investigator by downplaying his involvement in illegal poker and his relationship with the operation of the illegal poker game despite there being video evidence to the contrary. Mr. Frederiksen was sentenced to a year on federal probation, and Mr. Lamond respectfully requests a similar sentence.

In both cases, the courts found that probation or a combination of probation and home detention was sufficient to protect the public. The same is true here. Mr. Lamond is not a threat to the public at large; indeed, he still wants to help people. *See* Letter from Carolyn Montagna. And, while he understands he can't help people by being a police officer anymore, he never hurt anyone,

---

[12] *See Appeals Court upholds conviction of former capitol police officer who tried to help rioter*, AP (Sept. 6, 2024), https://apnews.com/article/capitol-police-riot-michael-angelo-riley-jan-6-insurrection-trump-aa6af70c71431358a4ad225aa7b082e2; *see also Retired Trooper sentenced to 1 year federal probation for lying to FBI*, KSN (Jan. 28, 2019), https://www.ksn.com/news/local/retired-trooper-sentenced-to-1-year-federal-probation-for-lying-to-fbi/.

not when he committed these crimes, not after he committed the crimes, and certainly not in the future, which is what probation or home detention would ensure. He has never been convicted of a crime in his life, and he doesn't need to be in prison to protect the public.

Recidivism and specific deterrence are not at issue here because Mr. Lamond is no longer a police officer and can no longer allegedly abuse whatever power he had. There is no risk he will repeat this conduct since the case has totally destroyed him financially and professionally. Arguably, this case may come down to general deterrence. Simply put, Mr. Lamond does not need to be in prison for four years when his life is already ruined, and imprisonment wasn't ordered in other similar cases.

Finally, as probation accurately notes, the fact that Mr. Lamond is a former police officer (and this matter received national press coverage) increases the possibility of susceptibility to abuse in prison, which has been affirmed as an unmentioned mitigating factor justifying a downward departure. *See Koon v. United States,* 518 U.S. 81, 116 (1996). Considering Mr. Lamond, a former police officer, may be subject to physical and verbal abuse by inmates, the Court may depart because the guidelines do not adequately take this into consideration. USSG § 5K2.0.

To promote the respect for the law, provide just punishment, protect the public, and afford adequate deterrence, Mr. Lamond respectfully requests the Court order he be sentenced to probation.

### d. Mr. Lamond's Health

Medical care, and a defendant's health, is a factor the Court may consider when determining what is a sufficient sentence for the convicted crimes. *See* 18 U.S.C. § 3553(a)(2)(D). About a year ago, Mr. Lamond started having lower back pain. The pain, coupled with tingling and loss of feeling in his legs and feet, have worsened. Mr. Lamond was recently diagnosed with

spinal disc degeneration (in discs L4 and L5), spinal stenosis, and a cyst on the right side of back, all which causes low back, hip, and leg pain, and loss of feeling in the legs and feet. *See* Kaiser Permanente, Progress Notes dated Apr. 14, 2025, attached as Ex. 6 ("Progress Notes"). Mr. Lamond received an MRI on April 7, 2025 which showed the cyst in particular is causing "severe spinal canal stenosis." *See* Kaiser Permanente MRI Lumbar Spine Results dated Apr. 14, 2025 attached as Ex. 7. Spinal stenosis is a condition where something happens, such as a herniated disk, to reduce the amount open space within the spine and can cause a myriad of symptoms, including the pain, numbness, and tingling Mr. Lamond feels.[13] While Mr. Lamond is still figuring out his treatment options, the likely recommendation will be for surgery with laminectomy and fusion. *See* Progress Notes at 2.[14] He has an in-person doctor's appointment on April 23, 2025 to discuss a further treatment plan and can update the Court at sentencing should the Court have any follow-up. That being said, Mr. Lamond respectfully submits that given his diagnosis, coupled with the other factors described in this Memorandum, probation is an appropriate sentence so Mr. Lamond can get the medical treatment and care he needs while caring for his family and serving his sentence.

---

[13]  *SeeSpinal Stenosis*, Mayo Clinic (June 27, 2024), https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961#:~:text=Herniated%20disk%20and%20bone%20spurs%20on%20spine,-As%20the%20spine&text=Spinal%20bones%20are%20stacked%20in,the%20spinal%20cord%20or%20nerves.

[14]  *See also Laminectomy*, Cleveland Clinic (Dec. 14, 2023), https://my.clevelandclinic.org/health/procedures/10895-laminectomy.

## <u>CONCLUSION</u>

For the foregoing reasons, Mr. Lamond respectfully requests that he be sentenced to a period of probation.

Date:  April 21, 2025                          Respectfully submitted,

   /s/ Mark E. Schamel
Mark E. Schamel (Bar No. 463965)
Ana L. Jara (Bar No. 1023086)
Venable LLP
600 Massachusetts Ave NW
Washington, DC 20001
Tel: (202) 344-4631
Fax: (202) 344-8300
Email: meschamel@venable.com
      aljara@venable.com

*Counsel for Defendant Shane Lamond*

### CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2025, I caused a copy of the foregoing to be sent via the

Court's CM/ECF system to all counsel of record.


    /s/ Mark E. Schamel          
Mark E. Schamel